

U.S. Department of Justice

United States Attorney
Eastern District of New York

AL:NMA:LKG/KDE  271 Cadman Plaza East
F.#2017R00242  Brooklyn, New York 11201

March 22, 2017

<u>By Hand and ECF</u>

The Honorable Roanne L. Mann
Chief United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Vincent Asaro, <u>et</u> <u>al.</u>
            <u>Criminal Docket No. 17-127 (ARR)</u>

Dear Chief Judge Mann:

      The government respectfully submits this letter to request permanent orders of detention with respect to defendants Vincent Asaro, John J. Gotti, Matthew Rullan, also known as "Fat Matt," and Michael Guidici.

      As further described below, because of the nature of the charges against the defendants, the strength of the government's case, the significant jail time the defendants face and their ties to variously the Bonanno organized crime family of La Cosa Nostra (the "Bonanno crime family" and "LCN") and LCN, the government has established by clear and convincing evidence that these defendants pose a danger to the community that cannot be mitigated by any condition or combination of conditions. Accordingly, they should be detained.[1]

---

[1] The government makes this motion without prejudice to making additional arguments in support of the detention of any of the defendants.

I.  Background

   A.  The Indictment

On March 8, 2017, a federal grand jury in Brooklyn, New York (the "grand jury") returned a sealed indictment charging defendants Asaro, Gotti and Rullan with arson conspiracy and arson, in violation of 18 U.S.C. §§ 844(n) and 844(i). The indictment further charges defendants Gotti and Rullan, along with Guidici, with bank robbery conspiracy and bank robbery, in violation of 18 U.S.C. §§ 371 and 2113(a).

Listed in the chart below is a summary of the charged counts:

| Count | Defendants | Charge |
|---|---|---|
| One | Asaro, Gotti, Rullan | Arson conspiracy, in violation of 18 U.S.C. § 844(n) |
| Two | Asaro, Gotti, Rullan | Arson, in violation of 18 U.S.C. §§ 844(i) and 2 |
| Three | Gotti, Guidici, Rullan | Bank robbery conspiracy, in violation of 18 U.S.C. § 371 |
| Four | Gotti, Guidici, Rullan | Bank robbery, in violation of 18 U.S.C. § 2113(a) and 2 |

The indictment returned in this case is the result of a long-term investigation by the Federal Bureau of Investigation (the "FBI") into the crimes and activities of the Bonanno crime family operating in, among other places, Howard Beach, Queens. Evidence of the charged crimes consists of, among other things, statements of eyewitnesses and victims, consensual recordings, video surveillance, telephone records and public records.

   B.  Charged Crimes

The government proffers the following facts concerning the charges at issue and pretrial detention.[2] See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention hearing); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

      1.  Arson

On April 1, 2012, the defendant Vincent Asaro, a long-time inducted member of the Bonanno crime family, was in a car in Howard Beach when he became enraged at another motorist who had switched lanes in front of Asaro at a traffic light. Asaro chased the

---

[2] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

other vehicle for a period of time at a high rate of speed. Later, Asaro enlisted the support of an LCN associate to obtain the other driver's address. With the information in hand, Asaro directed an associate of the Bonanno crime family ("Associate-1") to set fire to the other vehicle involved in the incident. On April 3, 2012, Asaro drove with Associate-1 to Broad Channel and pointed out the car to Associate-1. After receiving the order from Asaro, Associate-1 recruited defendants Matthew Rullan and John J. Gotti to commit the arson. Associate-1 believed that by following Asaro's order, he was ingratiating himself to a high-ranking member of the Bonanno crime family and enhancing his own reputation and status within the crime family.

In the early morning hours of April 4, 2012, Associate-1, Rullan and Gotti drove in Gotti's Jaguar sedan to a local gas station, where they filled a container with gasoline. The crew then drove to Broad Channel and located the vehicle that Asaro had earlier identified. Associate-1 doused the car with gasoline and Rullan lit it on fire. (See Gov. Ex. A (pictures depicting the burned vehicle)). Coincidently, a police officer in an unmarked car observed the crime in progress. Associate-1, Rullan and Gotti noticed the officer and fled the location in Gotti's Jaguar. Gotti led the officer on a high-speed chase through Broad Channel and Howard Beach until the officer abandoned the chase because the defendants were driving so recklessly. The next day, Associate-1 reported to Asaro that the vehicle had been burned as requested. Asaro, wanting to ensure that, in his estimation, the score had been settled, drove to the autobody repair shop where the vehicle had been towed to see the vehicle's charred remains.

2. <u>Bank Robbery</u>

Gotti and Rullan continued their criminal conduct after the vehicle arson described above. On April 18, 2012, approximately two weeks after the arson, Gotti and Rullan, along with Michael Guidici, robbed Maspeth Federal Savings and Loan Association in Maspeth, Queens (the "Bank"). The plan to rob the bank initially included Associate-1. Gotti told Associate-1 that his girlfriend was a teller at the bank (the "teller") and had access to important information regarding the bank's operation, including its security protocols and the quantity of currency available.

On the day of the robbery, April 18, 2012, at approximately 5:45 p.m., when the teller was working, Guidici entered the bank wearing a hat, coat and glove and proceeded to the teller. (See Gov. Ex. B (still image of Guidici in the Bank).) Gotti and Rullan waited outside of the bank for Guidici. Guidici presented the teller with a demand note that read, in part: "I HAVE A BOMB." The teller placed approximately $5,941 on the counter, which Guidici took. After taking the money, Guidici exited the bank and fled in a vehicle with Gotti and Rullan.

II. <u>Legal Standard – The Bail Reform Act</u>

Under the Bail Reform Act, 18 U.S.C. § 3141 <u>et</u> <u>seq</u>. (the "Act"), federal courts are empowered to order a defendant's detention pending trial upon a determination

3

that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release, and (4) the evidence of the defendant's guilt. See 18 U.S.C. § 3142(g).

Organized crime defendants pose a particular threat to the community due to the continuing nature of the charged enterprise and its violent criminal activities. Because organized crime defendants are often career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail. See United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual). For this reason, courts in this circuit have routinely ordered organized crime defendants detained pending trial. See, e.g., United States v. Cirillo, No. 05-CR-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese family members detained as dangers to the community), aff'd 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd sub nom. United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain detained as danger to the community). This reflects the fact that, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization. Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing United States v. Colombo, 777 F.2d 96, 98 (2d Cir. 1985)).

Congress has also noted that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit even non-violent crimes that are detrimental to the community. See S. Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984 U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3195 ("[L]anguage referring to safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community . . . . The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence."). In Salerno, the court approvingly quoted the Second Circuit's decision in Colombo, which had held:

4

> In light of Congress' direction that "[w]here there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate," . . . we hold that the decision to release Colombo based upon conditions which we consider to be wholly inadequate was clearly erroneous.

631 F. Supp. at 1371 (quoting Colombo, 777 F.2d at 99 (quoting Senate Report at 3189) (citation omitted)).

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. See United States v. Millan, 4 F.3d 1038, 1048-49 (2d Cir. 1993) (home detention and electronic surveillance can be circumvented); United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("home detention and electronic monitoring at best 'elaborately replicate a detention facility without the confidence of security such a facility instills'") (quoting United States v. Gotti, 776 F. Supp. 666, 672 (E.D.N.Y. 1991)); see also United States v. Tortora, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

III.     The Defendants Should Be Detained

For the reasons set forth below, the defendants each pose a substantial danger to the community. For each of these defendants, all of the relevant considerations under the Bail Reform Act strongly favor a permanent order of detention.

   A.     Nature and Circumstances of the Crimes Charged

As an initial matter, the defendants are all charged with crimes of violence. See Johnson v. United States, 779 F.3d 125, 129-30 (2d Cir. 2015) (holding that bank robbery under 18 U.S.C. § 2113(a) constitutes crime of violence under § 924(c) because it "has as an element the use, attempted use, or threatened use of physical force against the person or property of another"); United States v. Agnello, 101 F. Supp. 2d 108, 110 (E.D.N.Y. 2000) (detaining defendants charged with, among other crimes, "violations of 18 U.S.C. §§ 844(i) & (n) relating to conspiracy and attempts to damage property by fire . . . which are crimes of violence within the meaning of the Bail Reform Act"); see generally Jones v. United States, 529 U.S. 848, 852 (2000) (observing that the defendant was charged with arson, in violation of 18 U.S.C. § 844(i), as well as use of a destructive device in connection with a crime of violence, i.e., the arson, in violation of 18 U.S.C. § 924(c));

U.S.S.G. § 4B1.2 (defining "crime of violence" to include, among other things, federal felony offense of arson).

As set forth above, Asaro, Gotti and Rullan are charged with arson and arson conspiracy for a plan that involved setting fire to a private citizen's car after Asaro harassed the individual during a road rage incident. For this serious crime, they face mandatory minimum sentences of five years' imprisonment. See 18 U.S.C. § 844(i). Gotti and Rullan also face bank robbery and conspiracy charges, as does Guidici, and face up to 20 years in prison for their respective roles in that crime.

The nature of the charged crimes is extremely serious. The arson alone demonstrates the defendants' propensity to commit a dangerous act of violence without provocation. After a road rage incident involving the victim, Asaro responded not with a simple reprimand or cross word, but rather by invoking the full power of his position in the Bonanno crime family. Specifically, he enlisted the aid of an LCN associate to obtain the victim's address and then directed an underling in the Bonanno crime family to torch the victim's car in retribution, knowing that the car was parked on a public street in a residential neighborhood, putting lives at risk. And when asked to participate in the arson by Associate-1, defendants Gotti and Rullan agreed to do so not for any pecuniary gain but out of a similar allegiance to Associate-1. Indeed, the circumstances of the charged crime, the result of which is so disproportionate to the perceived offense by the victim, demonstrates by clear and convincing evidence that the defendants are dangerous and likely to resort to violence and violent means.

The bank robbery committed by Gotti, Rullan and Guidici is also a serious crime. These defendants used Gotti's relationship with a teller in an attempt to steal money from the Bank by threatening to explode a bomb. Although the defendants did not possess a weapon, this crime, committed just two weeks after actually bombing a car, further demonstrates these defendants' proclivity to violence.

B. Weight of the Evidence

As indicated above, the evidence of the defendants' guilt is exceedingly strong. The government intends to prove the defendants' guilt at trial through, among other sources, the testimony of multiple witnesses, consensual recordings, video surveillance, electronic evidence and documentary evidence.

The evidence of the defendants' participation in the arson is particularly strong. Video evidence captured Asaro meeting with Associate-1 prior to and after the arson of the vehicle. Additionally, telephone records confirm that Asaro and Associate-1 were in contact with one another. Witness testimony also corroborates the events leading up to the

6

arson and the way the arson was carried out, as well as the high speed chase that ensued when Associate-1, Rullan and Gotti were observed at the scene of the arson.

        C.        History and Characteristics of the Defendants

The history and characteristics of defendants Asaro, Gotti, Rullan and Guidici counsel in favor of detention.

        1.        Asaro

Asaro is a long-time and powerful member of the Bonanno crime family. Multiple cooperating witnesses have confirmed Asaro's membership in the Bonanno crime family for decades. For example, according to a cooperating witness ("CW-1"),[3] Asaro was inducted into the Bonanno family more than 30 years ago. CW-1 has advised that Asaro first held the position of captain in the 1990s, but a few years later lost the position (while remaining an inducted member). CW-1 has advised that in late 2012 or early 2013, Asaro was reinstated as a captain and became a member of the administration of the Bonanno family – i.e., a high-ranking member of the family who participated in making decisions and resolving disputes for the family.

Asaro's leadership position in the Bonanno family has been corroborated by his own consensually recorded statements. For example, on August 21, 2012, Asaro stated to CW-1, in substance and in part, "I'm a fucking friend [made member of LCN] thirty-seven fucking years, a wiseguy. Cocksuckers never did shit what I done in my fucking life." In another consensual recording on August 25, 2012, Asaro confirmed to CW-1, in substance and in part, that Asaro was recently promoted to "skipper [captain]" and was on "the panel" or the "commission" running the Bonanno family. Asaro's continued association with LCN is evidenced by his attendance at a December 21, 2015 Christmas Party held at a restaurant in Little Italy and attended by made members and associates of the Genovese crime family.

Asaro also has a significant criminal history. He has been arrested a total of approximately 21 times, beginning in 1957 when he was 21 years old, for crimes including rape, burglary, bank robbery, kidnapping, felonious assault and possession of a loaded firearm. Asaro also has a series of past felony convictions, including: (i) a 1960 conviction in New York County Criminal Court for unlawful entry; (ii) a 1960 petit larceny conviction in New York County Criminal Court; (iii) an assault in the third degree conviction in New York state court in 1967; (iv) a 1970 federal conviction in the Eastern District of New York

---

[3] CW-1 pled guilty to racketeering conspiracy, including predicate acts of Hobbs Act robbery and illegal gambling, pursuant to a cooperation agreement in the Eastern District of New York. CW-1's prior crimes include insurance fraud. CW-1 is cooperating in the hope of obtaining leniency in sentencing. CW-1's information has been corroborated by surveillances, as well as the testimony of other cooperating witnesses, consensual recordings, phone records and other materials.

for theft from an interstate shipment, for which he received a sentence of five years' probation; (v) a 1972 federal conviction in the Eastern District of New York for burglary of a post office, for which he received a sentence of six months' imprisonment (to be served on consecutive weekends for a year) and five years' probation; and (vi) 1998 convictions in New York state court for enterprise corruption, criminal possession of stolen property in the third degree and offering a false instrument to file, for which he received incarceratory sentences of four to twelve years and 28 months to seven years, respectively. Asaro was also convicted after a jury trial in New York state court of the misdemeanor of aggravated unlicensed operation of a motor vehicle in the second degree, for which he received a sentence of 6 months' imprisonment.[4]

Asaro's criminal activities have not slowed with age, and his criminal history and ongoing pattern of violence and intimidation indicate that Asaro is a danger to the community and should be detained pending trial. Indeed, the charged arson is alleged to have occurred when Asaro was 77 years old.

2.  Gotti

Gotti was convicted of Criminal Sale of a Controlled Substance in the Second Degree, Criminal Possession of a Controlled Substance in the Third Degree and Conspiracy in the Second Degree—all felonies—in February 2017. Gotti was recorded on a wiretap stating that he sold more than 4,200 pills a month and his narcotics trafficking operation generated $100,000 a month. When Gotti was arrested for this offense, the police recovered approximately $52,000 and 480 oxycodone pills from Gotti's bedroom. On March 3, 2017, 2017, Gotti was sentenced to 8 years' imprisonment, which he is presently serving.

3.  Rullan

Rullan was convicted of a felony, Attempted Assault in the Second Degree, in June 2014 and was sentenced to probation. He had been indicted for felony assault with a weapon and plea-bargained down to an attempt to commit that crime. In January 2016, he was convicted of Attempted Assault in the Third Degree, a misdemeanor, and sentenced to 45 days' jail. In April 2016, he was convicted of Harassment in the Second Degree, a violation that stemmed from his arrest for felony criminal contempt for violating an order of protection and aggravated harassment. Rullan's contempt charge and criminal history

---

[4] On November 12, 2015, Asaro was acquitted after trial of racketeering conspiracy and other counts. See United States v. Asaro, 14-CR-26 (ARR). Although the conduct that was the subject of the trial, including murder, robbery, extortion and other violent crimes, likely can be considered by the Court, see generally United States v. Proudfoot, 2013 WL 6670413, at *5 (D. Me. 2013) (observing that the court "presumably could consider acquitted conduct" in determining whether to revoke bail), the government respectfully submits that even putting aside such crimes, detention is warranted in this case. Additionally, his recent association with LCN evidenced by his attendance at the December 2015 holiday party illustrates his continued allegiance to organized crime.

8

demonstrate his disregard for the law and violence toward others. As such, and for the other reasons set forth in this letter, there is clear and convincing evidence that he is a danger to the community and should be detained pending trial.

4.  Guidici

Guidici was convicted of a disorderly conduct violation in April 2014 stemming from his arrest for a misdemeanor assault. Coupled with the current charges, specifically his role in the bank robbery, these factors support a finding by clear and convincing evidence that Guidici is a danger to the community and should not be released.

D.  The Danger Posed by the Defendants' Release is Serious

Each of the defendants poses a clear danger if released. Not only would there be a very serious danger to potential witnesses and victims, but the community at large would be at risk.

As mentioned above, Asaro, Gotti and Rullan's dangerousness cannot be underestimated in light of their involvement in the arson of a private citizen's vehicle on a public street in a residential neighborhood, an act meant to avenge a common driving incident. Because of Asaro's status, he is able to utilize the power and reach of the Bonanno family to direct others to commit acts of violence on his behalf. The same is true of Gotti and Rullan, who willingly carried out such an offense at the request of Associate-1.

Gotti and Rullan have also expressed a manifest disregard for law enforcement and cooperating witnesses, heightening the likelihood that, if released, they would engage in obstructive conduct. See 18 U.S.C. § 3142(f)(2)(B) (explaining that a court may also order detention if there is "a serious risk that the [defendant] will . . . obstruct or attempt to obstruct justice, or . . . intimidate . . . a prospective witness," among other things); see also United States v. Friedman, 837 F.2d 48 (2d Cir. 1988). As an initial matter, their refusal to heed the police officer's chase after the arson is indicative of their willingness to disobey conditions set by the Court. Additionally, they have demonstrated their disdain for cooperating witnesses and their desire to harm them. Gotti, for example, posted on his Instagram account a photograph of Salvatore Gravano, the cooperating witness against Gotti's late grandfather and former boss of the Gambino crime family, John Gotti, Sr. (who was convicted of, among other things, racketeering and murder) and wrote, "I literally laughed out loud when I see this pic. This is the man who ratted out my grandfather, who died in jail…and now it's your turn. Rat fuck." (See Gov. Ex. C (Instagram posting)). In addition, Gotti posted a photograph of the statue of liberty emblazoned with "Saddest thing in life is Not wasted talent but..Being a RAT is!!!!" (See Gov. Ex. D (Instagram posting)). Gotti also posted a screenshot of one of Rullan's Facebook postings, in which Rullan boasted: "Never been more dedicated to something in my life other than becoming one of new york citys finest criminals and it all comes down to tomarrow #fucknypd." (See Gov. Ex. E. (Instagram posting)).

9

In light of the defendants' substantial criminal histories and brazen disregard for law enforcement, this factor also weighs heavily in favor of detention. The risk of obstruction is particularly acute in light of the five-year mandatory minimum term of imprisonment the defendants face if convicted of the arson.

IV.    The Defendants Present A Risk of Flight

In addition to the facts set forth above, each of the defendants constitutes a flight risk due to the lengthy prison term each faces. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Even electronic surveillance and home confinement are not sufficient to guard against flight. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

On the arson charges, Asaro, Gotti and Rullan face a mandatory minimum sentence of five years' imprisonment and a maximum sentence of twenty years' imprisonment. On the bank robbery charges, Rullan and Guidici face a sentence of up to twenty years' imprisonment. The defendants' significant sentencing exposure gives them a substantial incentive to flee, which also counsels in favor of detention.

V.　Conclusion

　　　　For the foregoing reasons, the government respectfully submits that the Court should enter a permanent order of detention as to defendants Asaro, Gotti, Guidici and Rullan pending trial.

　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　BRIDGET M. ROHDE
　　　　　　　　　　　　　　　　　　　Acting United States Attorney

　　　　　　　　　　　　By:　　　　　　　/s/　　　　　　　
　　　　　　　　　　　　　　　　　　　Nicole M. Argentieri
　　　　　　　　　　　　　　　　　　　Lindsay K. Gerdes
　　　　　　　　　　　　　　　　　　　Keith D. Edelman
　　　　　　　　　　　　　　　　　　　Assistant U.S. Attorneys
　　　　　　　　　　　　　　　　　　　(718) 254-6232/6155/6328


cc:　Hon. Allyne R. Ross (by Hand)
　　　Defense Counsel, Esq. (by ECF)
　　　Clerk of the Court (ARR) (by ECF)

**EXHIBIT A**









**EXHIBIT B**







**EXHIBIT C**







# EXHIBIT E

