

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NMA/LKG/KDE                                              *271 Cadman Plaza East*
F. #2017R00242                                           *Brooklyn, New York 11201*

November 20, 2017

By Hand and ECF

The Honorable Allyne R. Ross
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Vincent Asaro
>       Criminal Docket No. 17-127 (S-1) (ARR)

Dear Judge Ross:

        The government respectfully submits this letter in anticipation of sentencing in the above-captioned case. The government respectfully submits that in determining what sentence to impose, this Court should consider, among other things, the defendant's lifelong allegiance to a dangerous criminal organization, his extensive participation in heinous criminal acts, including murder and obstruction of justice, and the nature of the charged crime, an arson he directed as a result of road rage. Taken all together, these factors demonstrate that the defendant has earned, and deserves, a sentence in excess of fifteen years' imprisonment.

## BACKGROUND

I.     Procedural History

        On March 8, 2017, a grand jury sitting in the Eastern District of New York returned an indictment in the above-captioned case charging the defendant and two co-defendants with, variously, knowingly, intentionally and maliciously damaging, by means of fire and an explosive, a vehicle used in interstate and foreign commerce, and conspiracy to do the same, in violation of 18 U.S.C. §§ 844(i) and 844(n).[1] See Docket Entry No. 1. The defendant was arrested on March 22, 2017 by the Federal Bureau of Investigation ("FBI") and made no post-arrest statements. See Pre-Sentence Investigation Report dated September 21, 2017 ("PSR") ¶ 13. The defendant moved for bail pending trial, which this Court denied

---

[1] The indictment also charged a fourth defendant with bank robbery and bank robbery conspiracy.

finding that the government had proven that the defendant's post-arrest conduct, including threats of violence directed at a prosecutor and his cousin (a cooperating witness) were "convincing and persuasive evidence of just how volatile, dangerous and violent the defendant remains, notwithstanding his advanced age." See Transcript of May 18, 2017 Bond Hearing, at 15, attached as Exhibit A.  Less than a month later, on June 13, 2017, the defendant pled guilty, pursuant to a plea agreement, to a single-count superseding information, alleging the defendant's participation in directing an arson of a car, in violation of the Travel Act (18 U.S.C. § 1952).  Id. ¶ 1.

In 2015, the defendant stood trial before the Court on a racketeering conspiracy spanning forty-five years and was acquitted.  See United States v. Asaro, Criminal Docket No. 14-26 (ARR), Docket Entry No. 328.  At trial, the government introduced evidence of the defendant's rise to power in the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family" and "LCN," respectively), including his participation in decades of crimes of violence, not limited to the 1969 murder of Paul Katz, the 1978 robbery of over $6 million in United States currency from the Lufthansa Airlines Terminal at John F. Kennedy Airport and loansharking and extortion up to the time of his 2014 arrest.  The defendant was incarcerated from his arrest in January 2014 to his acquittal in November 2015.  As set forth in the PSR, the defendant will receive credit for this period of incarceration, meaning that twenty-two months of incarceration will be deducted from whatever sentence the Court imposes on this case.  PSR ¶ 83.

II.     Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district court] must make an individualized assessment based on the facts presented."  Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to

2

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

When imposing sentence pursuant to 18 U.S.C. § 3553, a district court may consider a wide range of facts.  As the Second Circuit has observed, "Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant."  United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006).  In order to rely on conduct at sentencing, the court must find it proven by a preponderance of the evidence.  United States v. Beardsley, 691 F.3d 252, 274 (2d Cir. 2012); see also United States v. Cordoba-Murgas, 233 F.3d 704, 709 (2d Cir. 2000) (holding that the preponderance standard is "mandated"); United States v. Concepcion, 983 F.2d 369, 388 (2d Cir. 1992) (holding that disputed sentencing factors need only be proved by a preponderance of the evidence).

For example, a district court may rely upon acquitted conduct when making a sentencing determination.  United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after Booker, 543 U.S. 200 (2005), district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause.")  In fact, the Second Circuit has explicitly held, "[a] district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012); United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("with the mandatory nature of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection").

In considering whether to rely on acquitted conduct at sentencing, the Supreme Court's decision in United States v. Watts, 519 U.S. 148 (1997), underscores the difference between the government's burden at trial and at sentencing and the pitfalls in trying to draw meaning from a jury's verdict.  In Watts, the Supreme Court held that a jury cannot be said to have "necessarily rejected" any facts when it returned a verdict of not guilty.  Id. At 150, 155 (quotation marks omitted).  The Court emphasized the "significance of the different standards of proof that govern at trial and sentencing," explaining that an "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt."  Id. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)).  The Supreme Court explained:

> [I]t is impossible to know exactly why a jury found a defendant not guilty on a certain charge.  "[A]n acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.  Without specific jury findings, no

3

one can logically or realistically draw any factual finding inferences."

Id. (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1996) (dissenting opinion)).

Accordingly, this Court may rely at sentencing on the conduct underlying the conviction in the above-captioned case, as well as any facts it finds beyond a preponderance of the evidence, including acquitted conduct proven by evidence introduced at the defendant's 2015 trial on racketeering charges.

III.     Guidelines Analysis

As set forth in the PSR, pursuant to U.S. Sentencing Guidelines ("Guidelines") § 2K1.4(a)(2), the base offense level for the crime of conviction is a 20 because the arson of the vehicle created a substantial risk of death or serious bodily injury to the responding firefighters.  PSR ¶ 26.  In addition, based upon the defendant's role in the offense, he qualifies as an organizer, leader, manager or supervisor of criminal activity, such that Guidelines § 3B1.1(c) applies, adding two points.  PSR ¶ 29.  Finally, as set forth in greater detail below, the defendant willfully attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of the instant offense of conviction; pursuant to Guidelines § 3C1.1, an additional two levels are added.  PSR ¶ 30.  The total offense level is a 24.  PSR ¶ 34.

Based upon a Criminal History Category of II and a total offense level of 24, the defendant faces a Guidelines range of imprisonment of 57 to 71 months.[2]

---

[2] Although the plea agreement contemplated awarding the defendant three points for acceptance of responsibility, the Probation Department is correct that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant had not accepted responsibility for his criminal conduct[,]" absent extraordinary circumstances.  See Application Note 4 to § 3E1.1.  The government's calculation in the plea agreement was thus in error, which was contemplated by the plain terms of the plea agreement in paragraph 3, and the Court should find the correct Guidelines range of 57 to 71 months.  However, even if the Court does not find the obstruction of justice enhancement, should the defendant persist in denying his conduct relevant to the charged offense, he may otherwise be ineligible for a reduction for acceptance of responsibility.  See Application Note 1 to § 3E1.1.  ("In determining whether a defendant qualifies" for a two-point reduction for acceptance of responsibility pursuant to § 3E1.1(a), the Court can appropriately consider whether the defendant "truthfully admit[ted] the conduct comprising the offense(s) of conviction, and truthfully admit[ted] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."

IV.     Section 3553(a) Factors Weigh in Favor of a Significant Custodial Sentence

        A.     Nature and Circumstances of the Offense

        The crime of conviction perhaps best demonstrates the need for a significant sentence of incarceration in excess of fifteen years.  On April 1, 2012, the defendant, then a soldier in the Bonanno family[3] was involved in a road rage incident in Howard Beach, New York.  PSR ¶ 1.  Asaro was traveling in a car, which was cut off by another car driven by John Doe.  Id.  Asaro's car began to follow John Doe aggressively through Howard Beach, and a car chase ensued for ten minutes.  Id.  John Doe described the incident, in sum and substance, saying [Asaro's] car was trying to drive him off the road and cut him off.[4]  John Doe drove into Ozone Park, while trying to call the police and describe where he was.  When John Doe arrived in an area he knew to contain a red light camera, he intentionally circled the block trying to set off the cameras in an attempt to alert the police to his location.  John Doe believed a second car arrived on the scene to coordinate with Asaro's car and to try to box him in.  Eventually, police responded, but the two cars that had been chasing John Doe were gone.

        Significantly, John Doe's account of the incident where Asaro and others chased him through Howard Beach, specifically their aggressive behavior and his fear, are corroborated by New York City Police Department records.  Those records indicate that on April 1, 2012, John Doe called 911 and reported a car kept following him and trying to hit his car and that there were four guys in the car.

        On April 2, 2012, toll records indicate that Asaro contacted an associate of the Gambino organized crime family of La Cosa Nostra (the "Gambino family") who he knew to have access to local law enforcement databases.  PSR ¶ 2.  On April 3, 2012, a local law enforcement database accessed the license plate information for the plate of the car John Doe

---

[3] At the time of the arson, the defendant had been a soldier in the Bonanno family for over thirty years.  See infra, Section 4B1.  Shortly after the arson, during an August 25, 2012 recording, the defendant bragged, "[t]hey made me a captain" and that he was on the "panel."  GX 249, 249-T.  All transcript pages of testimony of the prior trial proceeding are attached as Exhibit B and all exhibits admitted at the prior proceeding are attached as Exhibit C by exhibit number.

[4] At the defendant's prior trial, the government introduced a November 7, 2011 consensual recording of another road rage incident involving the defendant, during which the defendant became incensed when a tow truck driver parked the tow truck "blocking a car wash on Cross Bay Boulevard."  GX 234, 234-T. T 1224-26.  During the interaction which took place approximately six months before the charged conduct, the defendant exited the car he was in and demanded the driver exit the two truck, screaming, "I'll kick your fucking head in you motherfucker you!"  GX 234-T at 2.  He also screamed, "Tell Charlie Vinny Asaro said it!  Ronnie's uncle!  I know where yous live you cocksuckers!"  GX 234-T at 3.

was in on April 1, 2012, which revealed John Doe's address.  Id.  Toll records indicate that the defendant was in contact with the Gambino family associate within minutes of the license plate search.  Video surveillance confirms that the defendant then met with the Gambino family associate at Tuscany Deli, whereupon the Gambino family associate provided the defendant with a piece of paper containing John Doe's address.

On April 3, 2012, the defendant met with a then-Bonanno family associate at Tuscany Deli ("CW-1") and directed CW-1 to burn John Doe's car.  Id.  Video footage corroborates the defendant's meeting with CW-1 and depicts them getting into a car together and leaving the area of Tuscany Deli.  The defendant then took CW-1 to show him where John Doe resided and to point out the car that had cut him off.

In the early morning hours of April 4, 2012, CW-1, along with two individuals he recruited to help him burn the car (co-defendants John Gotti and Matthew Rullan) went back to John Doe's house and set his car on fire, as Asaro directed him to do.  PSR ¶¶ 3-4.  CW-1 set fire to the car by pouring gasoline on its hood as defendant Rullan threw lit matches on top of it.  PSR ¶ 3.  After the arson, CW-1 and the defendant reconvened at Tuscany Deli, and CW-1 advised the defendant that he had burned the car as directed.  Id. ¶ 5.

For John Doe, the arson of his car was a continuation of the nightmarish car chase he had been caught up in days earlier.  He immediately linked the arson of his car with the road rage incident and felt fearful for his safety.  In sum and substance, John Doe believed that based upon the timing and circumstances of the rage incident and the arson, he had angered individuals associated with organized crime and the arson was retribution for the incident on the road.  The images of the arson of his car provide ample justification for his fear.  See Exhibit D (photographs of John Doe's burned car).

The defendant attempts to sanitize his crime, claiming that he "requested" CW-1 to set fire to the car after seeking and receiving the registration information of the other party's vehicle.  See Def.'s Ltr. dated October 30, 2017 at 1, not filed on ECF. As an initial matter, the defendant's version of events omits his request to another LCN associate to search a law enforcement database for the registration information, a fact extremely salient to the nature of the charged offense and indicative of the defendant's reach within LCN.

Next, the defendant characterizes his contact with CW-1 as a "request" to an individual "known to have committed arsons on previous occasions with no assistance from other individuals."  Id. at 2.  The defendant's claim that he "sought [] assistance," rather than directed CW-1, ignores the very nature of the organized crime hierarchy that the defendant operated in and benefitted from for his entire life, and oddly seeks to place more blame on CW-1, as if it were incumbent upon CW-1 to either refuse or, at the very least, burn the car on his own.[5]  In fact, as the Court is well aware, at the time of the arson, the defendant had

---

[5] In rejecting the defendant's bail application, this Court stated:

been an inducted member of organized crime for over 30 years, having also inducted into the crime family his son Jerome Asaro and his nephew Ronald Giallanzo, who CW-1 was on record with at the time of the arson.  Not only was the defendant a longtime inducted soldier of the Bonanno family in 2012, in the time period surrounding his purported "request" to CW-1, his star was again on the rise in the crime family, given waves of arrests that had decimated the leadership of the family.  On August 17, 2012, just after the arson, the defendant was consensually recorded talking about his meeting with the new Bonanno family boss, who asked the defendant to be consigliere, one of the top three power positions in the Bonanno family.  GX 240, 240-T at 3.  In late 2011, before the arson, the defendant was recorded saying, "I think I'm the only wiseguy left in the neighborhood.  Me, Jackie and uh, Noffi.  That's three, who else does he got?"  CW-2 responded, "The kid Mike," to which the defendant responded, "Yeah, but you know I'm saying people of substance."  GX 219, 219-T at 8.

The defendant approached CW-1 to commit the charged arson because he was aware of CW-1's status as an associate around Giallanzo, CW-1's desire to be inducted into the Bonanno family and CW-1's willingness to be involved in criminal activity.  Consensual recordings demonstrate that prior to the arson, the defendant was aware of CW-1 and his status as an associate assigned to his nephew Ronald Giallanzo.  T 1117-18, 1201.  Indeed, a September 2011 consensual recording captured Bonanno family soldier Michael Palmaccio telling the defendant that Giallanzo and CW-1 had opened a club, which the defendant then went to and gambled at.  GX 242, 242-T; GX 231, 231-T at 1.  Moreover, in the defendant's opposition to the government's detention memorandum, the defendant characterized CW-1 as a "one man crime wave" whose crimes included murder conspiracy, narcotics distribution, weapons possession, multiple home invasions, three armed robberies, loansharking, arson and robbery.  See Def.'s Bail Mem. at 13-14, not filed on ECF, attached at Exhibit E.  Those statements are perhaps the best evidence of his knowledge of CW-1, whose criminal history and Giglio has, to date, not been disclosed by the government.[6]

---

> I am convinced that defendant is a long-time and powerful member of the Bonanno family.  He was inducted into the family more than 30 years ago and held the position of Captain in the 1990s.  Although he thereafter lost the Captain position, he remained a member of the family and approximately five years ago became a member of its administration or leading body.

See Exhibit A at 13-14.

[6] Again the defendant's denial of all of these facts relevant to the circumstances of the offense, including that he used his position in organized crime to effect the arson may jeopardize his eligibility for a reduction for acceptance of responsibility as set forth, supra, at footnote 2 on page 4.

B.      History and Characteristics of the Defendant

        1.      The Defendant is a Lifelong Criminal

       The defendant has lived a literal life of crime and, for most of his life, evaded punishment.  His background puts the charged crime in context and explains how this defendant came to have the power, authority and arrogance to seek revenge for a minor traffic incident by having an organized crime associate burn the offending party's car to a crisp.  As an eighty-year old man who has participated in racketeering, murder, robbery, extortion, loansharking, gambling and other illegal conduct, he has served less than eight years in jail.  PSR ¶¶ 36-57.  In his own words on an August 21, 2012 recording, the defendant told a cooperating witness ("CW-2"), "I'm a fucking friend 37 fucking years, a wiseguy.  And another 50 years before that.  Cocksuckers never did shit what I done in my life."  GX 248, 248-T at 12.  During a November 28, 2011 recording, the defendant explained himself even more clearly, while comparing himself to Antonio "Na Na" Bonventre, another inducted member of the Bonanno family, saying:

> He's probably—you don't even know he's straightened out.
> Never did a fucking piece of work in his entire life.  Never
> fucking did nothing, fucking.  He was in this life, and fucking
> that was it, by name only.  Never did a fucking thing, never
> stole, never fucking had to steal. A lot of guys like that, god
> bless them.  My whole life I had to steal, I had to do everything.
> I had to do everything.  He never cracked an egg in his fucking
> life.  He never did nothing illegitimate in his fucking life.
> Never.

GX 236, 236-T at 11).  In his own words, the defendant acknowledged that he has earned his spot in organized crime by doing "everything," including stealing and murder ('cracking an egg').

       Indeed, among the worst crimes committed by this defendant, in addition to the charged arson, are the 1969 murder of Paul Katz, the 1978 robbery of over $6 million in United States currency and jewelry from the Lufthansa Airlines Terminal at John F. Kennedy Airport and his lifetime of loansharking.  As set forth in brief below, the government has previously presented the Court with evidence of these crimes consisting of the defendant's recorded statements, cooperating witness testimony, physical evidence and eyewitness testimony, among other evidence, that proves the defendant's guilt by a preponderance of the evidence.  The Court should consider these crimes when sentencing the defendant for the charged offense because it is within this background of life experience that in 2012, he had the power and authority to order CW-1 to commit the arson.

a.        The Murder of Paul Katz

Lawrence Katz was five years old when his father disappeared.  T 3039-69. His father, Paul Katz, was a truck driver who participated in truck hijackings and brought home different stolen merchandise, including electronics and fur coats.  T 3044-36.  He recalled his father unloading merchandise from trucks through the bedroom window of their home.  T 3044-45.  Lawrence Katz also recalled that in 1969, his father was arrested and then started having meetings with police officers, which caused his parents to argue.  T 3045-50. On December 6, 1969, Paul Katz received a phone call and left his house, leaving his wife in a panic and his five children waiting in the dark.  T 3064-65.  Paul Katz was twenty-eight years old when he disappeared.  T 3040.  For over forty-five years, until the FBI recovered his remains in a house on 102nd Road in Queens, New York (the "Queens Residence"), Lawrence Katz's family had no idea what had happened to him or whether he was dead or alive.

Paul Katz was murdered and his body hidden away by the defendant and his good friend, criminal partner and notorious Lucchese family associate Jimmy Burke.  CW-2 testified in detail about the defendant's request to meet secretly with Jimmy Burke at houses CW-2 was building on 102nd Road.  T 718-719.  When CW-2 met Burke and the defendant at the Queens Residence, they backed a car into the driveway of the Queens residence, went into the basement and asked CW-2 to keep watch.  T 720.  CW-2 described the basement floor as concrete poured over rebar and remembered as he waited, he heard a sledgehammer hitting the concrete.  Id.  When Burke and the defendant were done, the defendant took CW-2 to the defendant's fence company to get materials to cover the hole Burke and the defendant had dug.   T 721.  The defendant told CW-2 that he and Burke had strangled Paul Katz to death with a dog chain because Katz was a "rat," perceived to be cooperating with law enforcement.  T 721-22.  The defendant further told CW-2 that he had hit a water pipe with a breaking bar, indenting the pipe.  T 722.  CW-2 described how he covered the hole, which was oblong, with lime and cement.  T 723.

CW-2 also testified that in the 1980s, the defendant called him to his fence company business and directed CW-2 to take his son Jerry Asaro and get rid of the body of Paul Katz.  T 728-29.  CW-2 went back to the Queens Residence with Jerry Asaro, which he accessed with a key provided by the defendant, and dug up Katz's remains, including corduroy material, and described how the body had seemed to be slumped forward into the hole.  T 729-30, 1347-48.

CW-2's testimony was corroborated in every respect.  First, the defendant's son Jerome Asaro pled guilty before Your Honor to moving Paul Katz's body on October 10, 2014.  See Transcript of J. Asaro Guilty Plea, attached as Exhibit F.  After being placed under oath, Jerry Asaro stated:

> From January 1968 to December 1987 I was associated with an
> enterprise whose activities affected interstate commerce and
> participated in the enterprise through a pattern of racketeering

> activity, that in fact knowing that a murder had been committed,
> I assisted persons in moving the body of that person after the
> fact."

Id. In addition, forensic anthropologist and expert witness Bradley Adams testified that he went to the Queens Residence to execute a court-ordered search warrant and recovered human remains, including a fully articulated hand and teeth, as well as large pieces of concrete and fabric. T 3119-3129, GX-143-1. Based upon his review, the bones were consistent with an adult male and he submitted certain of the remains for DNA analysis. T 3133-3139. Frances Rue, a Criminalist with the Office of the Chief Medical Examiner, testified that she compared a DNA profile developed from the bones recovered from the FBI search of the Queens Residence to DNA samples from Paul Katz's family members and, based upon her analysis, concluded the DNA belonged to Paul Katz. T 3143-3160.

Finally, on June 17, 2013, as the FBI began its search for the remains of Paul Katz at the Queens Residence, CW-2 made his last recording, during which he told the defendant, "[t]he feds are all over Liberty Avenue."[7] GX 244, 244-T. In the moment where the defendant understood that CW-2 was referring to the location of Paul Katz's body, he understood CW-2 was an informant and looked at CW-2 with disgust and hatred. T 1353-54. The defendant's last words to CW-2 were "Don't call me." T 1354.

>     b.     The Lufthansa Heist

In 1978, the defendant planned and oversaw the robbery of millions of dollars in United States currency from the Lufthansa Airlines Terminal. T 768-819. CW-2 testified in detail about the planning and execution of the robbery, which was masterminded by the defendant's close criminal associate Jimmy Burke. T 783. CW-2 carried out the robbery with Burke's son Frankie Burke, who drove the black van that was used, and the rest of the robbery team, while the defendant and Burke waited nearby as the "crash car." T 783-84. CW-2 testified how he cut the chain link fence, letting the van carrying the robbery team into the warehouse area where he and Frankie Burke subdued several different employees who happened upon the robbery, including one who was pistol-whipped and one who was stopped at gunpoint and who were both then placed into the van and driven into the warehouse. T 788-791. CW-2 testified how the employees were kept in the lunchroom and a worker opened the vault door, which contained fifty boxes of cash in one hundred dollar denominations, sacks of jewelry and gold chains and foreign money that was all packed into the van. T 791-92. The robbery team took the money to CW-2's house, where certain of the team remained behind to count up the money and inventory the jewelry. T 795-97. They had successfully stolen over $6 million dollars and entrusted their "end" to close friends including "Johnny Tags" and "Ronnie." T 804-11. Jewelry, including gold chains, watches

---

[7] CW-2's testimony is corroborated down to the smallest detail. For example, in the course of the FBI search, the agents observed a dented pipe, just as CW-2 described, in the course of their own search. GX 142G, T 3085-86.

and rings, were given in tribute to members of organized crime, including Bonanno captain Joseph Massino, and sold to Gambino soldier Tony Lee, who owned a gold store.  T. 814-17.

CW-2 was again corroborated in detail as to the manner of the robbery and the division and storage of its proceeds.  For example, Rolf Rebmann, who was a Lufthansa Airlines employee present at the time of the robbery, confirmed that he was one of the workers outside of the warehouse who was forced at gunpoint into a van.  T 1745-49.  John Tagliaferro testified that he was a friend of the defendant's family and once while playing cards at the defendant's social club observed the defendant with Jimmy Burke.  T 1798-99.  Mr. Tagliaferro further testified that at some point between July 1977 and 1980, CW-2 brought him a small case and asked him to hide it in his house, which Mr. Tagliaferro did.  T 1800-01.  He also recalled that CW-2 came back and took money from the case and gave Mr. Tagliaferro $100.  T 1801.  Eventually the defendant himself came to collect the case from Mr. Tagliaferro's house.  Id.  Likewise, Ronald Ceschini testified that sometime before 1981, CW-2 asked him to hold a bag he believed to contain paper for him.  T 2429-30.  Mr. Ceschini held it at his parent's house until his parents found it and then he asked CW-2 to pick up the package, which CW-2 did.  T 2432-34.  Mr. Ceschini felt obligated to hold the bag because of CW-2's relationship with the defendant and specifically because, in sum and substance, shortly before CW-2 requested he hold the bag, the defendant had helped Ceschini when Ceschini felt threatened by someone he had a dispute with in the neighborhood.  T 2427-32.

In addition to the corroboration provided by Ceschini, Rebmann and Tagliaferro, three additional cooperating witnesses testified about the defendant's involvement in the Lufthansa Heist.  See T 495-98 (testimony of cooperating witness Salvatore Vitale) (In the 1970s, he drove then-Bonanno family captain Joseph Massino to meet the defendant, who gave Massino gold jewelry, specifically gold chains, from the Lufthansa Heist); T 2016-18 (testimony of cooperating witness Peter Zuccaro) (Frankie Burke told Zuccaro that he drove the van in the robbery, that CW-2 participated for the defendant and that, after the robbery, the defendant stole CW-2's "end" and blamed Burke); T 2556-58 (testimony of Anthony Ruggiano) (Ruggiano's father told him that the defendant and Burke brought jewelry from the Lufthansa Heist to him and "Tony Lee" at the gold store).

Recordings of the defendant also confirm his participation in this massive and notorious armed robbery.  For example, during a June 15, 2012 recording, the defendant had the following exchange with CW-2 about the wake of Henry Hill, who had died:

CW-2:       That's one last left of Lufthansa.

ASARO:       Who?

CW-2:       I said he's one less left of Lufthansa.

ASARO:       Fuck him.  Cocksucker.

| CW-2: | He made a big thing like he was there with us. |
|---|---|
| ASARO: | Yeah. |
| CW-2: | Fucking scumbag. |
| ASARO: | Piece of shit. |

GX 238, 238-T.  During a February 17, 2011 recording, the defendant spoke of the Lufthansa Heist again, saying, "It's life, we did it to ourselves, it's a curse with this fucking gambling. We never got our right money, what we were supposed to get, we got fucked all around, got fucked all around, that fucking Jimmy kept everything."  GX 218, 218-T.

    c.  Loansharking

    At the 2015 trial, the Court also heard ample evidence of the defendant's lifelong participation in loansharking and extortion and other organized crime-related rackets, specifically consensual recordings of the defendant's statements, cooperating witness testimony, victim witness testimony and other evidence.  For example, during a December 9, 2010 recording, the defendant described a confrontation with a Lucchese soldier and former captain; in his own words, the defendant told him:

> The fucking motherfucker.  I said, "Who the fuck are you
> talking to, you cocksucker?"  "Oh, you can't talk to me like
> that."  "Who the fuck are you?"  He says, "I'm a friend."  "You
> ain't my friend."  "Fuck you, you cocksucker,
> you gotta learn the fucking rules.  I'm here thirty-five years.
> The only thing I got is my fucking age and you ain't gonna
> fucking bust my chops."

GX 216, 216-T.  This recording is compelling evidence of the defendant's power and prestige in organized crime in 2010, attending a sit-down with inducted members of organized crime and essentially cursing them out without repercussions.

    On December 6, 2011, the defendant was consensually recorded going to collect money owed by a car business, saying:

> I said, "Tell him not to be a fucking tough guys with me."  I
> says, "Listen to me, if I don't get my fucking money, I'll take it
> out on the cars."

GX 239, 239-T at 6.  Neither the defendant's age nor his health issues prevented him from seeking out the debtor and threatening his business.  He warned them against being "tough guys" and threatened to hurt the cars if the money was not paid.  This recording also

demonstrates that even before the arson, as a result of his years of participation in organized crime, the defendant had the means to carry out violence through his association with the Bonanno family, an enterprise he has been a member of since the late 1970s, and he was not hesitant to use those means and threaten others with them.

During a June 11, 2013 consensual recording, the defendant talked about a dispute he had with the acting boss of the Bonanno family, as follows:

> I had a big fight with him the other day.  We had $30,000 coming, he took $15,000 of it.  I want to kill this motherfucker. We had $30,000 coming, me, Jackie and Jerry.  All right?  He says, "Well without us we wouldn't have collected it."  So we went for the money, gave me five, they gave him 15.  He says, "You owe me two."  Forget about the four, I owed him another two.  All right?  "I'm taking the two"  I said, "Tom, I ain't got nothing, man"  I says, "you're taking 15?"  "Yeah, without me," he says, "you wouldn't a got nothing."  GX 243, 243-T at 7.

The Court also heard from other witnesses about the defendant's lifetime participation in loansharking and extortion, including from some of his victim's themselves. See, e.g. T 750-54, 841-51, 945-52 (trial testimony of CW-2), T 2018-20 (trial testimony of Peter Zuccaro), T 2393-2407 (testimony of John Zaffarano).

### 2.    The Defendant Continued His Conduct While Incarcerated

Even after being arrested in this case, the defendant persisted in his criminality, enlisting a co-defendant in a plot to murder a prosecutor in this case.  The government intends to prove this conduct by a preponderance of the evidence, as required by the case law, through the presentation of evidence related to a confidential source and corroborating evidence, including video surveillance and Bureau of Prisons records.

A confidential source ("CS-1") was housed with the defendant at the MDC and certain of his co-defendants.[8]  Over the course of a few days, the defendant told CS-1, among other things, about his prior case that resulted in an acquittal.  See United States v. Asaro, 14-CR-26 (ARR) (E.D.N.Y.).  According to CS-1, the defendant stated that his "rat cousin" showed law enforcement agents where the body of Paul Katz was buried.  The defendant also threatened that, if he ever saw his cousin again, he would kill him.[9]

---

[8] CS-1 has previously felony convictions, including making a false statement.

[9] As the Court is aware, in the defendant's prior case, the defendant's cousin (CW-2) testified at trial as a cooperating witness about, among other things, the defendant's admissions regarding his participation in the murder of Paul Katz and the robbery of the Lufthansa Airlines terminal.

In addition to threatening his cousin, the defendant also made numerous threats about his prosecutor.[10]  Specifically, according to CS-1, the defendant told one of his co-defendants, who is a Bonanno associate, "We need to do something about this bitch [referring to the prosecutor], and not fuck it up like Vinny.  We need to handle this."  When the Bonanno associate told the defendant that they should talk about it later, the defendant continued to argue for the murder of the prosecutor, saying that for him, even a few years in prison could be a life sentence.  The Bonanno associate stated that "Vinny" was Vincent Basciano, also known as "Vinny from the Bronx."  Basciano, the former acting boss of the Bonanno crime family, is currently serving a life sentence for murder.  See United States v. Basciano, 05-CR-060 (E.D.N.Y.).  During the penalty phase of Basciano's death penalty trial, cooperating witnesses described how Basciano solicited and tried to direct the murder of his federal prosecutor.  See id., Gov't. Mot. Regarding Uncharged Penalty Phase Evidence, Dkt. No. 1200, at 14-19; see id., Penalty Phase Tr., at 8800-8806 (testimony of Joseph Massino), attached as Exhibit G.  According to CS-1, on another occasion, the defendant said to the Bonanno associate, "We need to handle this and do something about this bitch [a reference to the prosecutor]."  At that point, the Bonanno associate pulled the defendant aside and they spoke privately.

Accordingly, on at least two occasions since his incarceration, the defendant discussed having his prosecutor murdered, knowing that he was speaking to loyal Bonanno associates with an incentive to please him and the means to carry out such a heinous crime.  The defendant's words themselves are chilling, suggesting that he and the Bonanno associate "not fuck it up like Vinny," referring to Basciano's failed plot to murder his prosecutor.  This conduct, occurring within the last year, shows that despite the claims of ill health and agedness, the defendant remains a danger to the community and persists in his criminality, making time-served or a minimal jail sentence inconsistent with the aims of Section 3553(a) and inappropriate.

### 3.    The Defendant's Arguments Are Unavailing

In arguing for the equivalent of a time-served sentence, the defendant argues that (1) the crime was unrelated to the Bonanno family, (2) the defendant is a "very dedicated and loved family man," (Def.'s Ltr. at 6), and (3) the Bureau of Prisons ("BOP") cannot provide the health care the defendant requires.  Id. at 11.

First, the government has described, supra at Section VI.A, that the defendant was a well-known member of organized crime who asked a Bonanno associate, then assigned to the defendant's nephew Ronald Giallanzo, to burn the victim's car.  The Court should

---

[10] The defendant also bragged to CS-1 about being charged with the Lufthansa Heist and "beating" the case, saying, "We did it and got away with it."  The defendant spoke about committing crimes with Jimmy Burke and thirteen people that were killed after the Heist. The defendant said that he had put in "work" (referring to carrying out a murder) but Burke was a stone-cold killer.

reject the defendant's thin attempt to word-smith his guilty plea to avoid responsibility for using his status in organized crime to carry out this serious crime. The defendant also chalks up the incident to "purely a matter of road rage." Id. at 2. However, the arson was not committed immediately in the hour after the incident or during the incident or by a random acquaintance of his. Rather, the defendant directed a Bonanno associate to burn the victim's car days later, evidencing his cold, calculating criminality.

Next, while there is no doubt that the defendant has the support of his family, his loyalty to his blood family has not been the governing principle of his life. During the defendant's trial, the Court heard the defendant talk about his induction of his own son Jerry Asaro into the Bonanno crime family and his relationship with J. Asaro, who he tapped to move the body of Paul Katz in the 1980s, a crime to which J. Asaro pled guilty and for which the Court sentenced him to seven and half-years in jail. Using his son to cover up a murder is perhaps the best example of the regard the defendant bears his blood family.[11]

Finally, while the defendant has suffered from health problems to be sure, none of the problems described by the defendant are untreatable within the Bureau of Prisons. See Exhibit H, Letter from John Manenti, Northeast Regional Medical Director. Additionally, certain of the facts proffered by the defendant about unnecessary surgery during his prior period of incarceration should have been addressed with the Court and the government during the period of his prior incarceration if they, in fact, occurred and should not be considered evidence that the defendant's medical concerns will be ignored.[12]

C.      Other Section 3553 Factors

In addition to considering the defendant and the crime, Section 3553(a) directs the Court to consider the need for the sentence imposed: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant." All of these factors counsel in favor of a significant custodial sentence for this defendant, even at his age and with his described-health.

---

[11] While the defendant makes much of the businesses he owned and his lifelong employment, his reported earnings to the government for the years 1970 through 2016 (excluding the short time he was incarcerated) averages just over $5,000 per year. In fact, the information provided by the defendant regarding his employment demonstrates the alternatives the defendant had to the life of crime he chose. Had he put the same time and energy into lawful business pursuits, including his fence companies, he would not be in the position he now finds himself.

[12] As of this date, the government does not have sufficient information to respond to the allegations raised by the defendant related to his treatment during the prior period of incarceration.

The offense is inherently quite serious- a crime in which an organized crime family member used a local law enforcement database to facilitate the arson of a car who had cut him off in traffic.  Were the Court to do what the defendant asks – and sentence him to time served – or even a sentence within the advisory Guidelines range, given the credit the defendant will receive for his prior period of incarceration, such leniency would not promote respect for the law or provide just punishment for the offense.[13]  At a July 2009 sentencing of a Colombo family captain, the Honorable Jack B. Weinstein imposed a sentence of 120 months, significantly above the Guidelines range of 63 to 78 months, and observed the following:

> I believe that under these circumstances, ten years is a sentence
> that is appropriate, not too long, not too great, and anything less
> would not send a message. The people, the youngsters in this
> city have to understand that they cannot join this organization
> and that when they do they destroy their lives.

United States v. Uvino, 07 CR 725 (JBW).  Here, given both the crime of conviction and the defendant's decision post-arrest to attempt to obstruct his prosecution for a violent offense by harming his prosecutor, a sentence of less than fifteen years' imprisonment will not deter this defendant or others from engaging in similar conduct.

---

[13] In that case, the defendant would serve significantly less time than his son, who remains incarcerated on a 90-month sentence for helping his father move the body of Paul Katz, which seems especially unjust.

16

V.      Conclusion

           For the reasons set forth herein, the government respectfully submits that the
defendant be sentenced to a term of incarceration in excess of fifteen years.

                                                  Respectfully submitted,


                                                  BRIDGET M. ROHDE
                                                  Acting United States Attorney

                                       By:  _____/S/_____
                                                  Nicole M. Argentieri
                                                  Lindsay K. Gerdes
                                                  Keith D. Edelman
                                                  Assistant U.S. Attorney
                                                  (718) 254-7000


cc:     Defense counsel (by ECF and Email)
        Clerk of Court (by Email)


17